UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| BETTY LYKINS ) | |
| ) | |
| Plaintiff, ) | Case No. 3:05-0329 |
| ) | Judge Trauger |
| v. ) | |
| ) | |
| BRIDGESTONE FIRESTONE NORTH ) | |
| AMERICAN TIRE, LLC and CONTRACT ) | |
| LABOR SERVICES, INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

This matter comes before the court on a Motion for Summary Judgment filed by the defendant (Docket No. 49), to which the plaintiff has responded (Docket No. 53), and the defendant has replied (Docket No. 59). For the reasons discussed herein, the defendant's motion will be granted.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Betty Lykins worked for defendant Bridgestone Firestone North American Tire, LLC ("Bridgestone") at its LaVergne, Tennessee tire manufacturing plant, from August 1999 through February 2006. (Docket No. 50 at p. 2)[1] In Spring 2003, Ms. Lykins complained to one of her supervisors that she was being harassed at work every night by a "lumper" named Miguel Campos. As a "lumper," Mr. Campos loaded and unloaded tires at the warehouse. At the time,

---

[1] Unless otherwise noted, the facts have been drawn from the plaintiffs' First Amended Complaint (Docket No. 22); the plaintiffs' Response in Opposition to Motion for Summary Judgment (Dockets No. 53); the plaintiff's Responses to Defendant's Statements of Undisputed Material Facts (Docket No. 54); and the plaintiff's Statement of Additional Facts (Docket No. 55).

1

Ms. Lykins' job duties involved driving a tow motor in the same warehouse on twelve-hour rotating shifts. Mr. Campos was not an employee of Bridgestone, but rather of co-defendant Contract Labor Services, Inc. ("CLS").

Mr. Campos had been calling Ms. Lykins "baby" and "sweetie," referring to her as his girlfriend, and repeatedly questioning Ms. Lykins about her romantic life during Ms. Lykins' shifts. This behavior continued, despite Ms. Lykins' protests that she did not want Mr. Campos to talk to her that way and Ms. Lykins' requests that Mr. Campos leave her alone. After Ms. Lykins spoke with her supervisor, Howard Shelton, however, the behavior did stop for two to four weeks, presumably due to action taken by Mr. Shelton. (Docket No. 57, Ex. 2 at p. 7) After this period of time, Mr. Campos's behavior resumed. At one point, Mr. Campos attempted to put his arm around Ms. Lykins, who pushed his hand away and told him not to touch her. After this incident, Ms. Lykins complained to Mr. Shelton again, and the behavior ceased for another four to six weeks. (*Id.*)

Eventually Mr. Campos resumed his amorous attentions. Mr. Campos would follow Ms. Lykins around the warehouse, make unwelcome comments and kissing gestures, and wink at her. The situation appears to have reached a breaking point one evening in the Fall of 2003, when Mr. Campos told Ms. Lykins that "he liked her 'booty' and 'wanted to take it home' with him." On her next shift, Ms. Lykins reported Mr. Campos's behavior to a different supervisor, Larry Norman. Mr. Norman, who did not know about the earlier complaints, told Ms. Lykins that behavior such as Mr. Campos had been exhibiting would not be tolerated and promised Ms. Lykins that it would stop. Mr. Norman spoke to Mr. Campos about his behavior, and Mr. Campos's comments stopped. However, Ms. Lykins alleges that Mr. Campos continued to

"appear where she was working and watch and stare at her."

Several months later, around January 2004, Mr. Campos began to engage in non-verbal conduct that upset Ms. Lykins. Ms. Lykins alleges that, while she was "trying to do her job," Mr. Campos would speak Spanish to sanitation employees, presumably within earshot, and during these conversations, Mr. Campos would wink and smile in Ms. Lykins' direction. Ms. Lykins alleges that the sanitation workers would then look at her and laugh. This caused Ms. Lykins to believe that the conversations were about her.

One day, during the last week of April 2004, as Mr. Campos was passing Ms. Lykins in a motorized cart, he made "kissing gestures" at her. After this incident, Ms. Lykins complained about Mr. Campos to Gary Young, the operations manager of the warehouse. The next evening, Ms. Lykins contacted the human resources department to discuss her problems with Mr. Campos and spoke with Meredith Mullins. Ms. Mullins told Ms. Lykins that she would investigate her claims. This investigation appears to have consisted of a conversation with Mr. Campos, in which Mr. Campos admitted to at least some of the behavior. As an immediate solution, Ms. Mullins suggested that Ms. Lykins should be restricted to a certain area of the warehouse, in order to avoid any further contact with Mr. Campos. This suggestion was implemented, and it appears to have been successful, but Ms. Lykins remained displeased that it was her movement, and not Mr. Campos's that was being restricted. The plaintiff does not allege any inappropriate conduct from Mr. Campos from this point forward.

Roughly three days after their initial meeting, Ms. Lykins presented to Ms. Mullins a letter discussing the incidents outlined above. Ms. Mullins did not share the letter with Mr. Shelton, Mr. Norman, or Mr. Young. However, all three men wrote reports regarding the

3

plaintiff's complaints to them. Ms. Lykins continued to work for Bridgestone until the evening of February 1, 2006, when she quit her job for unrelated reasons. (Docket No. 50 at p. 2)

Ms. Lykins filed this action on April 22, 2005, alleging (1) sexual discrimination in violation of Title VII and (2) sexual discrimination in violation of the Tennessee Human Rights Act ("THRA") Tenn. Code Ann. § 4-21-101 *et seq.* against Bridgestone/Firestone North American Tire, LLC and Bridgestone Americas Holding, Inc. (Docket No. 1) On August 10, 2005, the plaintiff filed a First Amended Complaint, naming Bridgestone/Firestone North American Tire, LLC and Contract Labor Services, Inc. as defendants and adding claims for (1) sexual assault and battery and (2) intentional infliction of emotional distress against CLS, in addition to the Title VII and THRA claims. On March 7, 2007 the plaintiff and defendant CLS filed a Joint Stipulation of Dismissal (Docket No. 61), which the court granted in its Agreed Order of Dismissal on March 8, 2007. (Docket No. 62) On January 5, 2007, defendant Bridgestone moved for summary judgment. (Docket No. 49)

## ANALYSIS

**I.      Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must demonstrate the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

4

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd*., 224 F.3d 797, 800 (6th Cir. 2000). Our function "is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case—provided that the nonmoving party bears the burden for that element—the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To avoid summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). And we must keep in mind that "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. Finally, "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49). With this standard in mind, the court turns to

5

an analysis of the plaintiff's claims.

## II.     Hostile Work Environment

The plaintiff alleges that the defendant impermissibly discriminated against her on the basis of sex, in violation of Title VII and the Tennessee Human Rights Act ("THRA"), by maintaining a hostile work environment. The Supreme Court has observed that a supervisor impermissibly discriminates on the basis of a protected characteristic when he harasses a subordinate because of that characteristic. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 64 (1986).[2] However, the harassment need not lead to an economic or tangible effect on the employee; rather, when "the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment,'" it is actionable harassment under Title VII. *Id.* at 66 (quoting *Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)); *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998).

In order to establish a hostile work environment in violation of Title VII, a plaintiff must prove that (1) she was a member of a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on the employee's protected status, such as her sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant

---

[2] Because "the stated purpose and intent of the [THRA] is to provide for execution within Tennessee of the policies embodied in the federal civil rights laws," *Campell v. Florida Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996) (citing Tenn. Code Ann. § 4-21-101(a)(1)), the analysis of claims under the THRA is the same as under Title VII. *Id*. *See also Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 464 (6th Cir. 2001). Accordingly, the analysis of plaintiff's Title VII claims applies to his THRA claims as well. *Bredesen v. Tennessee Judicial Selection Commission*, 214 S.W.3d 419, 430-31 (Tenn. 2007) (referring to Title VII cases in determining whether a hired party is an employee for the purposes of the THRA).

6

knew or should have known about the harassing conduct but failed to take reasonable care in preventing or correcting the harassing behavior. *See Farmer v. Cleveland Pub. Power*, 295 F.3d 593, 604–05 (6th Cir. 2002); *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560–61 (6th Cir. 1999).

"Harassment affects a 'term, condition or privilege of employment' if it is sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and creates an abusive working environment." *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1079 (6th Cir. 1999). In considering whether conduct is sufficiently "severe or pervasive" the court must consider the workplace in both objective and subjective terms. Objectively, the environment must be such that "a reasonable person would find [it] hostile or abusive." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993); *see also Faragher*, 524 U.S. at 787; *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999). In addition, to satisfy the subjective element, the plaintiff must show that she "subjectively perceive[d] the environment to be abusive." *Harris*, 510 U.S. at 21; *see also Faragher*, 524 U.S. at 787; *Jackson*, 191 F.3d at 658.

Whether a workplace environment is objectively hostile or abusive is determined by considering the totality of the circumstances, including such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Harris*, 510 U.S. at 23; *see also Faragher*, 524 U.S. at 787–88. The Sixth Circuit has noted the Supreme Court's recurring observation that "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788 (citations omitted),

7

*quoted in Hafford v. Seidner*, 183 F.3d 506, 512–13 (6th Cir. 1999).

The Sixth Circuit has cautioned courts not to disaggregate incidents of alleged hostility in evaluating a hostile work environment claim, for fear of diluting the significance of the incidents. *See Williams*, 187 F.3d at 563; *Jackson*, 191 F.3d at 660; *see also Smith v. Leggett Wire Co.*, 220 F.3d 752, 765 (6th Cir. 2000) (Martin, J., dissenting). Rather, courts should review the work environment as a whole and analyze the cumulative effect of the incidents, each of which might not independently cross the "Title VII threshold." *Williams*, 187 F.3d at 564; *see also Smith*, 220 F.3d at 765 (Martin, J., dissenting). In addition, an action that is not specifically sexual in nature can constitute proof of a hostile work environment if it would not have occurred but for the fact of the plaintiff's sex. *Williams*, 187 F.3d at 565 (stating that non-sexual conduct can contribute to a sex-based hostile work environment if it would not have occurred but for the fact of the plaintiff's sex).

The plaintiff has failed to make an objective showing that the alleged harassment affected a term, condition, or privilege of her employment**.** The plaintiff has alleged improper conduct on behalf of one co-worker, not a supervisor, the most offensive of which appears to have been an attempt to put his arm around her, which she rebuffed. The remainder of the alleged conduct—Mr. Campos's sudden appearances near the plaintiff, his calling the plaintiff by names such as "baby" and "sweetie;" a single comment regarding the plaintiff's "booty" and other remarks the plaintiff presumes to have been about her, but cannot say for sure, because they were in Spanish; kissing gestures, winks and smiles—fall squarely under the rubric of "simple teasing." Although none of these incidents can be said to have been isolated, the periods of Mr. Campos's improper behavior were punctuated by long inactive periods, because the plaintiff's

supervisors took action concerning her complaints. The court understands that Mr. Campos's behavior must have caused the plaintiff annoyance and some distress, but it does not rise to the level of severity required for an objective showing of an abusive work environment. The conduct was not physically threatening or humiliating, and the plaintiff has not shown that it affected her work performance. The allegations do not "amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788; *see also Bowman v. Shawnee State University*, 220 F.3d 456, 464 (6th Cir. 2000) (holding that conduct on the part of a supervisor, including a shoulder rubbing incident, buttock grabbing at a Christmas party, and an invitation to try out a whirlpool were not "severe and pervasive" enough to create a hostile work environment); *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787-90 (6th Cir. 2000) (holding that the plaintiff could not establish "severe or pervasive sexually harassing conduct," where a supervisor had told several dirty jokes in the plaintiff's presence, allegedly made a verbal sexual advance in conjunction with her performance evaluation, referred to the plaintiff as "Hot Lips," and made comments regarding her state of dress). Accordingly, the plaintiff cannot establish a Title VII claim on the basis of a hostile work environment.

## CONCLUSION

For the reasons stated herein, the defendant's Motion for Summary Judgment will be granted.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

9